

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-25-1998

# Wolfe v. City of Pittsburgh

Precedential or Non-Precedential:

Docket 97-3360

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Wolfe v. City of Pittsburgh" (1998). *1998 Decisions.* Paper 58.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/58

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 25, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-3360

JUNE M. WOLFE; JOSEPH J. CAMPISI; PAUL R. RENK;
STEVEN R. GARDNER; GEORGE T. TROSKY;
MICHAEL F. BROWN; GEORGETTE A. SCAFEDE;
ANTHONY R. DUMRAUF

v.

CITY OF PITTSBURGH

George Trosky, Michael Brown and Paul Renk,
        Appellants

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 95-cv-00664)

Submitted Pursuant to Third Circuit LAR 34.1(a)
March 16, 1998

Before: SLOVITER, RENDELL and SEITZ, Circuit Judges

(Filed: March 25, 1998)

        Thomas H. Ayoob, III
        Pittsburgh, PA 15222

        Michael L. Rosenfield
        Pittsburgh, PA 15219

         Counsel for Appellants

        Diego Correa
        Jacqueline R. Morrow
        City of Pittsburgh
        Department of Law
        Pittsburgh, PA 15219

         Counsel for Appellee

OPINION OF THE COURT

SLOVITER, Circuit Judge.

Appellants George Trosky, Michael Brown, and Paul
Renk, white male police officers, filed this action under 42
U.S.C. S 1983, 42 U.S.C. S 1981, Title VII, and Pennsylvania
state law alleging that the City of Pittsburgh discriminated
against them on the basis of their race when it failed to
promote them to the rank of lieutenant. Appellant officers
argue that the 1979 federal court order setting a quota for
minority hiring had expired before the promotions were
made, therefore exposing the City to liability. The officers
filed a motion for summary judgment but instead the
district court granted summary judgment on behalf of the
City. We have jurisdiction under 28 U.S.C. S 1291. Our
review is plenary.

I.

This case arises from a history of discriminatory practices
in the hiring and promotion of minority officers in the City
of Pittsburgh police department which spawned extensive
litigation dating back to 1975, and which generated at least
six published decisions regarding the appropriate remedies
and other related issues. In 1975, Chief Judge Weber,[1] the
district judge originally presiding over the case, found that
the City's hiring procedures involved a pattern and practice
of racial and sexual discrimination; as a remedy, the court

_____

1. Although we do not ordinarily trace the history of a case in terms of
the district judge by name, in this case three district judges have
presided over different phases of the litigation and the identity of the
judge who signed each order is relevant.

2

imposed a "temporary interim preferential hiring quota" whereby appointments would be made from qualified lists in groups of four as follows: one white male, one white female, one black male, and one black female. Commonwealth v. Flaherty, 404 F. Supp. 1022, 1030-31 (W.D. Pa. 1975). Although that order, by its terms, appears to have applied only to hiring, the City thereafter filed a request with the court to authorize it to promote 18 lieutenants and 24 sergeants "straight down" the eligibility list without regard to race or gender. The Commonwealth of Pennsylvania, the NAACP and the Guardians of Greater Pittsburgh (on behalf of black policemen) opposed the City's proposal because it would perpetuate the racial imbalance.

Judge Weber denied the City's request to promote "straight down" but, citing the pressing need of the City to fill vacancies, ruled on October 12, 1979, that:

> We will allow the defendants, however, to promote up to 18 individuals to the rank of lieutenant and up to 28 to the rank of sergeant with the mandate that one of each six promoted to either rank must be minority members otherwise qualified.

> We do not command how this shall be done. The officers of the City of Pittsburgh have as great a duty to follow the mandates of the Constitution as does this court. During all the progress of this lawsuit we have found very little evidence of an active effort by the City to solve the problems of race and sex discrimination by action on its own rather than relying entirely on the mandate of this court at every step. There is a pool of eligible candidates for both grades containing minority members who have at least demonstrated some capacity by scoring a passing grade on the examinations, and by prior satisfactory service as patrolman and in some cases as sergeants. Because the pool of eligible candidates for lieutenant contain minority members, some of whom have experience as sergeants, and because the eligibility list for sergeants contain qualified minority members, such selection can be made within the statutory scheme.

Commonwealth v. Flaherty, 477 F. Supp. 1263, 1266-67 (W.D. Pa. 1979) (emphasis added). With respect to the

duration of his "mandate that one of each six promoted to either rank must be minority members otherwise qualified," Judge Weber stated only:

> Because the present promotional list is of limited duration, and will expire within the coming year, the problem may be ameliorated in future years because of the eligibility of minority members and women newly hired as police officers under our prior order. The effects of the prior discriminatory practices will be lessened in the future.

Id. at 1267.

Almost immediately the question arose whether a Hispanic officer was a "minority" under the October 12, 1979 order, and on December 19, 1979, Judge Weber issued a temporary restraining order preventing the City from promoting a Hispanic officer under the aegis of the October 12, 1979 order, clarifying that the term "minority" as used in the October order referred to black officers, not Hispanic officers. App. at 10-11. On January 9, 1980, Judge Weber made the temporary restraining order issued December 19, 1979 permanent, stating that "[t]he City of Pittsburgh is ordered and directed to proceed under the order of this court of October 12, 1979, and in making such promotions as were allowed therein it shall promote one black police officer of the plaintiff class of each six officers so promoted." App. at 12. See also Commonwealth v. Flaherty, 482 F. Supp. 305, 307 (W.D. Pa. 1980).

Sometime thereafter, the City filed a motion for "Modification of Court Opinion and Order." It sought to make three promotions to lieutenant and six promotions to sergeant and asked, in essence, if promoting one minority to each position was "in accordance with the program of racial balance pursuant to this Court's order." App. at 13-14. On October 6, 1980, Judge Weber permitted the proposed promotions "in accordance with the mandates of the Court Order of October 12, 1979." App. at 15.

In addition to the racial discrimination that was the subject of the orders in question, the City was the subject of allegations of gender discrimination in hiring. Judge Weber conducted a nonjury trial on this claim and awarded

4

judgment and back pay to plaintiffs. See Commonwealth v. Flaherty, 532 F. Supp. 106 (W.D. Pa. 1982); Commonwealth v. Flaherty, 547 F. Supp. 172 (W.D. Pa. 1982).

In 1984, the Fraternal Order of Police, on behalf of white male officers who claimed they were passed over for promotion in favor of minority officers, moved to "terminate" the October 12, 1979 order which, according to the motion itself, "imposed, in part, a program of preferential affirmative promotions to the ranks of sergeant and lieutenant. . . ." App. at 17–18. Judge Weber denied the motion on January 25, 1984, stating merely: "The grounds of the present motion were considered at the time the original order was entered and rejected." App. at 18. On appeal, this Court affirmed the order "without prejudice to presentation of a proper petition alleging changed circumstances and/or law." See App. at 24.

The F.O.P. filed another challenge later that year to the one-in-four minority hiring quota scheme imposed in 1975. On August 30, 1984 Judge Weber denied the F.O.P.'s petition, but in the course of his memorandum order referred to his October 12, 1979 order as having "imposed a program of preferential affirmative promotions applicable to the ranks of sergeant and lieutenant in the Pittsburgh Department of Police." App. at 23.

Seven years later, in 1991, white candidates for police officer challenged the 1975 one-in-four hiring quota system. The matter came before then Chief Judge Cohill, who now presided. Judge Cohill dissolved the hiring quota, but in doing so noted the distinct orders covering hiring and promotion within the police department and stated, inter alia:

> We note that in the earlier years of the preliminary injunction's operation, Judge Weber addressed the issue of promotion of women and minorities and entered appropriate remedial orders. As Judge Weber did, we view the preliminary injunction [re hiring] as separate from the issue of promotions. Thus, our Opinion today has no effect on these earlier orders. Likewise, we view these findings of discrimination in promotion as unrelated to our consideration of the preliminary injunction.

5

Commonwealth v. Flaherty, 760 F. Supp. 472, 480 (W.D. Pa. 1991) (citations omitted). The Commonwealth subsequently appealed from the dissolution of the preliminary injunction, but this court upheld the dissolution of the 1975 hiring quota. Commonwealth v. Flaherty, 983 F.2d 1267 (3d Cir. 1993).

It was not until 1993 that the NAACP and the Guardians of Greater Pittsburgh, co-plaintiffs in the original actions, sought action with respect to the court order regarding promotions. Noting the progress made by the City and an agreement the parties had reached, the plaintiffsfiled a formal motion to "dissolve the order of October 12, 1979." In a one-sentence order dated December 15, 1993 Judge Cohill dissolved the order of October 12, 1979. App. at 43. The following year, we reversed the district court's award of attorneys' fees to intervening white police officers against the Commonwealth in the hiring case. Commonwealth v. Flaherty, 40 F.3d 57 (3d Cir. 1994).

II.

With this history in mind, we turn to this appeal by the plaintiff officers of the district court's grant of summary judgment for the City. The basis for the officers' S 1983 suit against the City is their contention that the October 12, 1979 order entered by Judge Weber had automatically dissolved in 1980 and thus was not in effect in April 1993 when they were bypassed for promotion in favor of minority officers. Therefore, although they do not expressly so argue, we infer they are arguing that more recent decisions restricting race-based promotions apply here.

Judge Smith, the district judge to whom this latest case was assigned, rejected that argument, holding that the October 12, 1979 order was in effect until its dissolution by Judge Cohill on December 15, 1993, and that the City is shielded from liability when acting pursuant to a court order. Judge Smith also held that the City did not have a duty to challenge the order following changes in the law, a contention plaintiffs apparently made in the district court that they do not repeat here. Finally, Judge Smith held that the promotions made in April 1993, before the dissolution, were consistent with the then-effective 1979 mandate.

The history of this case set forth above shows that the parties operated in the apparent belief that there were parallel orders: one entered in 1975 covering hiring and one entered in 1979 covering promotions. Although the status of the October 12, 1979 order was not without ambiguity in the years thereafter, there is ample support for Judge Smith's holding that the order was in effect until dissolved in 1993. Foremost is the subsequent ruling by Judge Weber himself in 1984 denying the F.O.P.'s request to dissolve the 1979 quota system mandated by the October 12, 1979 order. Indeed, if Judge Weber regarded the order as having expired in 1980, it is unlikely he would have entertained a motion for its dissolution on the merits.

Moreover, there is the inescapable fact that there was no judicial action on the docket regarding the October 12, 1979 order until Judge Cohill dissolved it on December 15, 1993, after the promotions in question. Although plaintiff officers dismiss the 1993 dissolution as mere "housekeeping," that is not persuasive in light of the fact that Judge Cohill had earlier dissolved the parallel 1975 order dealing with hiring in 1991 and expressly stated that the dissolution of the 1975 injunction had "no effect" on the promotions quota system. Commonwealth v. Flaherty, 760 F. Supp. at 480 (citations omitted).

In reviewing the history of the injunction governing hiring in 1993, we commented that "[t]his case is unusual because the preliminary injunction remained in effect for more than fifteen years, during which time no party sought to pursue the action on the merits or to dispose of the issue of permanent injunctive relief." Commonwealth v. Flaherty, 983 F.2d at 1269. A similar comment could be made regarding the injunction governing promotions. Although it may have initially served as a preliminary injunction, in time and with judicial rejection of efforts to dissolve it the October 12, 1979 order became effectively a permanent injunction and the parties and the courts so treated it.

While the 1979 order did not affirmatively direct the City to promote officers, it did conditionally mandate that if the City effectuated such promotions, they were to be made in conformity with that order. The Policemen's Civil Service statute, however, obligated the City to address promotions.

7

53 Pa. Stat. Ann. S 23535 ("Vacancies in positions in the competitive class shall be filled by promotions from among persons holding positions in a lower grade in the bureau of police.") (emphasis added). Thus, it is clear that the City faced but one real course -- a Hobson's choice-- to follow the court's order. As such, the City has not deliberately adopted an "official policy," other than to follow the law, that would give rise to section 1983 liability. See Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986); cf. Lockhart v. Hoenstine, 411 F.2d 455, 460 (3d Cir. 1969) ("[A]ny public official acting pursuant to court directive is [ ] immune from suit"); Turney v. O'Toole, 898 F.2d 1470, 1472-73 (10th Cir. 1990) (citations omitted) ("officials charged with the duty of executing a facially valid court order enjoy absolute immunity from liability for damages in a suit challenging conduct prescribed in that order.. . . `Facially valid' does not mean `lawful.' An erroneous order can be valid.").

In light of our agreement with Judge Smith that the 1979 order was effective in 1993, we see no more basis to impose liability upon the City for the 1993 promotions than there would have been to impose liability upon it for the 1979 promotions. There is nothing in the record to suggest that in making the 1993 promotions the City acted other than in the belief that the 1979 court order continued to apply. Not until Judge Cohill's order of December 15, 1993 was this litigious episode in the history of the City of Pittsburgh finally put to rest.

We see no error by the district court in its application of the relevant legal principles, and we will affirm the grant of summary judgment.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

8